| Facility | Date Aware of Litigation | Action Taken on Notification of Litigation |
| --- | --- | --- |
| | mail; the other has been discharged from the Air Force. | |

Guy W. PARKER, Plaintiff,

v.

The UNITED STATES, Defendant.

Nos. 06–701C, 06–715C.

United States Court of Federal Claims.

June 28, 2007.

Guy W. Parker, Poway, California, pro se.

Tara J. Kilfoyle, United States Department of Justice, Civil Division, Washington, D.C., counsel for Defendant.

## MEMORANDUM OPINION AND ORDER

BRADEN, Judge.

### I. FACTUAL BACKGROUND.[1]

#### A. Facts Relevant to the First Complaint.

On March 22, 2004, the United States Air Force ("USAF") awarded a fixed-price contract, FA8621–04–D–6250 ("Contract"), in the amount of $3,000,000, to Guy Parker d/b/a Parker International ("Plaintiff"). *See* First Compl. Ref. Doc. at 1, 3, 17. The Contract required Plaintiff to provide a software license for the MQ/RQ–1 Predator Unmanned Aerial Vehicle Multi–Task Trainers ("Predator MTT"), located at Nellis Air Force Base; Indian Springs, Air Force Auxiliary Field; and Luke Air Force Base. *Id.* at 18. The Contract also provided that the contractor would perform "preventive and corrective software maintenance[,]" as well as upgrade the software, when instructed to do so by the USAF. *Id.* at 18–19. The Contract's term was for one year of Predator MTT operations and maintenance, with an option to renew for up to four additional one-year periods. *Id.* at 17.

Paragraph 2.4.2 of the Statement of Work for the Contract provides that "upon request of the project officer, the contractor shall attend conferences, briefings, and other meetings to report on MTT sustainment/update plans and status." First Compl. Ref. Doc. at 20.

On April 19, 2004, the Assistant Secretary of the Air Force for Acquisition issued a Memorandum about the dissemination of internal Air Force e-mails to outside sources. *See* Gov't Mot.App. at 116. The April 19, 2004 Memorandum directed Air Force acquisition personnel to include a "cautionary statement [2] in all official correspondence." *Id.* The Memorandum acknowledged that the cautionary statement was not binding on e-mail recipients; nevertheless, inclusion of the statement would be effective on May 1, 2004, as a matter of Air Force Policy. *Id.*

On January 27, 2006, the USAF renewed the Contract for 2006. *See* First Compl. Att. 18. On February 15, 2006, the Contracting Officer ("CO") notified Plaintiff "that [2006 would be] the last year the Government intended to purchase a site license under the [ ][C]ontract." Gov't Mot.App. at 42.

On June 15, 2006, the Program Manager for Predator Training ("Mr Kimmet") sent an e-mail to Plaintiff, and several other individuals, regarding a proposed June Predator MTT program support meeting, requesting that each recipient submit agenda items and recommended meeting dates. *See* First Compl. ¶ 10; First Compl. Att. 8; Gov't Mot. App. at 43. At the bottom of the e-mail was a cautionary statement that read:

> *Caution: This message may contain competitive, sensitive or other non-public information not intended for disclosure out-*

---

1. The facts recited herein were derived from: the October 10, 2006 Complaint ("First Compl."), attachments thereto ("First Compl. Att."), and Reference Document ("First Compl. Ref. Doc."); the October 16, 2006 Complaint ("Second Compl.") and attachments thereto ("Second Compl. Att."); Defendant ("the Government")'s February 9, 2007 Motion to Dismiss, Or In The Alternative, For Summary Judgment ("Gov't Mot.") and Appendix thereto ("Gov't Mot.App."); the Government's February 9, 2007 Proposed Findings of Uncontroverted Fact ("Def.PFF"); Plaintiff's March 19, 2007 Response In Opposition to the Government's Motion to Dismiss ("Pl. Resp.Mot.Dis."); Plaintiff's March 19, 2007 Response in Opposition to the Government's Motion For Summary Judgment ("Pl.Resp.SJ"); Plaintiff's March 19, 2007 Response to the Gov-

ernment's Proposed Findings of Uncontroverted Fact ("Pl.Resp.PFF"); and the Government's April 6, 2007 Reply ("Govt' Reply").

2. The cautionary statement was to state:

> *Caution: This message may contain competitive, sensitive or other non-public information not intended for disclosure outside official government channels. Do not disseminate this message without the approval of the Office of the Assistant Secretary of the Air Force for Acquisition. If you received this message in error, please notify the sender by reply e-mail and delete all copies of this message.*

Gov't Mot. Dis.App. at 116 (emphasis in original).

*side official government channels. Do not disseminate this message without the approval of the sender. If you received this message in error, please notify the sender by reply e-mail and delete all copies of this message.*

First Compl. ¶ 10 (emphasis in original); First Compl. Att. 8; Gov't Mot.App. at 43.

On June 16, 2006, Plaintiff responded, stating that Plaintiff "cannot accept the adhesion contract at the bottom of your email. . . . This email transmittal . . . is the property of the company and may be reproduced, copied, and transmitted by the company as required." First Compl. Att. 7. On June 19, 2006, Mr. Kimmet replied, explaining that the inclusion of the cautionary statement was "USAF policy." *See* First Compl. Att. 6.

On June 19, 2006, Plaintiff sent another e-mail to Mr. Kimmet and the CO with the request to "resend this email to the company without the addition of the adhesion contracts contained within and added on the bottom of the transmittal[.]" First Compl. Att. 5. The June 19, 2006 e-mail included eight "notes" at the end of the document that appear to state the legal and factual grounds for Plaintiff's belief that he was not required to abide by the cautionary statement included on Mr. Kimmet's June 15, 2006 e-mail. *See* Gov't Mot.App. at 48–49.

On June 22, 2006, Mr. Kimmet sent another e-mail to Plaintiff and the other recipients of the June 15, 2006 e-mail, canceling the proposed June meeting, because there were no "specific agenda items requiring my attention at this time." [3] *See* First Compl. Att. 3.

### B. Facts Relevant to the Second Complaint.

The Contract required that Plaintiff deliver a monthly Contractor Management Report to the CO that included "a breakdown of labor hours expended in support of the contract over the past month, [ ] an estimate of hours planned for the coming month[, and] the actions taken in support of this effort to include a detailed listing of functional changes." *See* Gov't Mot.App. at 22; *see also* Second Compl. Att. 8 at 19, Att. 16 at 37. The Contract also provided that the Government would reply to the Contractor Management Reports "with an approval, approval with comments, or disapproval within 45 days[.]" *See* Gov't Mot.App. at 78. The Contract also provided that the format of the Contractor Management Reports could vary, in specified ways, from the standardized requirements of the Data Item Description form, DI–MGMT–80227, approved by the Office of Management and Budget. *See* Second Compl. Att. 16 at 37. The Report was due on the fifteenth day after the first full month of contract performance, making March 15, 2006 the first due date under the 2006 contract renewal. *Id.*

The content and format of the Contractor Management Reports caused several disagreements between the CO and Plaintiff throughout 2006. *See, e.g.* Second Compl. Att. 22 (March 22, 2006 Memorandum from the CO to Plaintiff stating that the first Contractor Management Report due for CY06 had "not been received and is considered late"); Second Compl. Att. 5 (April 18, 2006 Memorandum from the CO to Plaintiff stating that the March/April Contractor Management Report was disapproved, requesting that Plaintiff resubmit the Report after making certain changes); Second Compl. Att. 11 (May 1, 2006 Memorandum from the CO disapproving Plaintiff's November/December Contractor Management Report); Second Compl. Att. 14 (May 11, 2006 letter and e-mail from Plaintiff to the CO stating that the April 18, 2006 and the May 1, 2006 Memoranda of Disapproval were "disapproved" and "rejected" by Plaintiff and asserting that the two memoranda "may represent actions directed to defraud this company and government").

On May 15, 2006, Plaintiff submitted a Contractor Management Report to the CO, wherein Plaintiff stated that the Report was

---

**3.** Mr. Kimmet's June 22, 2006 e-mail provides:

Without specific agenda items requiring my attention at this time, I'm cancelling program meeting [sic] that I tentatively scheduled for June. If a program meeting is required in the future, I'll notify participants. (ref. MTT SOW Para 2.4.2)

If you have any questions, please contact me[.] First Compl. Att. 3.

a "courtesy" and, because of "the absence of a government Program Management Plan and in the absence of reported discrepancies as per contract, this concludes the report." *See* Second Compl. Att. 7. On June 1, 2006, the CO sent Plaintiff a Memorandum approving the May 15, 2006 Contractor Management Report. *See* Second Compl. ¶ 1, 10. The Memorandum also stated that "[t]he contractor reported an absence of discrepancies and the MTTs were available to support scheduled training. All attachments to the contractor's letter (same subject) dated May 15, 2006 were not considered part of the data submittal." *See* Second Compl. ¶¶ 11–12, 55; *see also* Second Compl. Att. 1.

On June 7, 2006, Plaintiff sent a letter and an e-mail to Lieutenant General John Hudson, Commander, Aeronautical Systems Center, Wright–Patterson AFB, Ohio, and Lieutenant General Donald Hoffman, Military Deputy, Office of the Assistant Secretary of the Air Force for Acquisition. *See* Second Compl. Att. 6; *see also* Gov't Mot. Dis.App. at 97. The letter stated that the June 1, 2006 CO Memorandum "contains false statements and acts of omission that are equally as false and damaging as one of commission." *See* Second Compl. Att. 6. The letter asserted that the Contract required the USAF to provide the contractor with "a report of problems, discrepancies, and a list of functionality changes." *Id.; see also* Second Compl. ¶ 17. The letter further stated that the CO's statement that "[t]he contractor reported an absence of discrepancies[ ]" was false because Plaintiff "could not report discrepancies, or the lack of them, because the contractually required Air Force reports were not provided [to the Plaintiff]." *Id.* The letter stated that the inclusion of this statement within the June 1, 2006 Memorandum was part of a larger problem of deficient "internal procurement oversight with ASC and Air Force procurement." *Id.* Plaintiff specifically requested "advice on how to remedy the promulgation of these inaccurate and misleading statements and prevent reoccurrences" in the absence of "accessible real and effective government procurement oversight." *Id.*

On June 23, 2006, Brigadier General David Eichhorn responded to Plaintiff's June 7, 2006 letter to Generals Hudson and Hoffman, stating that the USAF "reviewed the status of this effort with the Simulator Systems Group and [is] satisfied that ASC has appropriate acquisition oversight processes in place to address your concerns." Second Compl. Att. 19.

## II. PROCEDURAL HISTORY.

On October 10, 2006, Plaintiff filed a *pro se* Complaint in the United States Court of Federal Claims, alleging three causes of action. *See* Compl. ¶¶ 18–23. First, Plaintiff seeks a declaratory judgment that the USAF required Plaintiff "to accept the contract officer representative's adhesion contract(s) found at the bottom of the contract officer representative's contract communications as a condition for performance" of the Contract. *Id.* ¶ 22. Plaintiff alleges this "adhesion contract" impedes contract performance and imposes costs "not anticipated at the time of bid and at the time of award." *Id.* ¶ 18. Second, Plaintiff seeks a declaratory judgment that the adhesion contract was "an improper use of the Privacy Act as stated within United States Air Force Directive AFI33–332 29 JANUARY 2004 and the Privacy Act of 1974." *Id.* ¶ 23. Third, Plaintiff seeks "monetary damages of $1.00" plus court costs of approximately $499. *Id.* ¶ 24.

On October 16, 2006, Plaintiff filed, *pro se,* a Second Complaint in the Court of Federal Claims. The precise relief requested by Plaintiff is unclear. The Complaint requests several overlapping declaratory judgments relating to the CO's statement in the June 1, 2006 Memorandum that: "The contractor reported an absence of discrepancies[.]" Second Compl. ¶¶ 51–56. The gravamen of Plaintiff's Complaint appears to be a request that the court enter a declaratory judgment that the CO's statement was "a false statement" and the CO "knowingly and willfully sustained the false statement when provided sufficient notification and time to correct the mistake." *Id.* ¶ 51. Plaintiff also seeks "monetary damages of $1.00" plus court costs of approximately $499. *Id.* ¶ 57. The October 16, 2006 Complaint initially was assigned to

the Honorable Lynn J. Bush. On October 16, 2006, the case was assigned to the Honorable Christine Miller for ADR pilot proceedings.[4] On November 6, 2006, the case was transferred to the undersigned judge for further proceedings.

On November 3, 2006, Plaintiff filed: a Motion to Apply Rule 40.2 of the Rules of the United States Court of Federal Claims ("RCFC"); a Motion for a Temporary Restraining Order; a second Motion for a Temporary Restraining Order; and a Motion to Provide a Restraining Order. On November 21, 2006, the Government filed Responses.

On November 20, 2006, Plaintiff filed a Motion for a Temporary Restraining Order "from the government contract officer from issuing unilateral changes to the contract." On November 21, 2006, the court held a telephone status conference. On December 1, 2006, the Government filed a Response.

On November 30, 2006, the court issued a Memorandum Opinion and Order consolidating Case Nos. 06–701C and No. 06–715C. *See Parker v. United States,* 74 Fed.Cl. 488 (2006). In addition, the Government was directed to provide a short letter addressing the court's jurisdiction over the claims asserted in Plaintiff's two Complaints. *Id.* at 489. The court also established a deadline for Plaintiff to file a Response and thereafter for the Government to file a Motion to Dismiss, if necessary. *Id.* On January 4, 2007, the Government filed this letter. On January 12, 2007, Plaintiff provided the court with a Response.

On December 28, 2006, the Government filed a Notice of Filing Original Declarations, attached to Motion for Expedited Consideration and Clarification. On January 9, 2007, Plaintiff filed a "Preliminary," an "Intermediate," and a Final "rebuttal to defendant's representative motion for expedited consideration and clarification."

On January 22, 2007, the court held a telephone status conference. On that same date, Plaintiff filed a Plea That the Government is in Default and a Response to "defendant's motions to dismiss for lack of subject matter jurisdiction, failure to state a claim upon which relief may be granted defendants opposition to plaintiff's motion 5." On January 26, 2007, the Government filed a Response.

On February 1, 2007, Plaintiff filed: an "Affirmative Action Plea to eliminate insubstantial defenses regarding the Government's Response to Plaintiff's Plea that the Government is in default;" and a "Motion to supplement the administrative record and a Motion for leave to file copied signatures."

On February 9, 2007, the Government filed a Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment. In support of the Motion, the Government also filed Proposed Findings of Uncontroverted Fact.[5] On March 19, 2007, Plaintiff filed: a Response to the Government's Motion to Dismiss; a Response to the Government's Motion for Summary Judgment; and a Response to the Government's Proposed Findings of Uncontroverted Fact. On April 6, 2007, the Government filed a Reply.

On February 20, 2007, Plaintiff filed a Motion to Provide ADR Option. On March 27, 2007, Plaintiff filed a Motion for Extension of Time Until March 26, 2007 to File Reply to Response to Motion to Provide ADR option. On April 3, 2007, the Government filed a Response. On May 7, 2007, Plaintiff filed a Reply.

On February 21, 2007, Plaintiff filed a Motion "to correct errors within the judicial administration of complaints." On March 6, 2007, the Government filed a Response to the Motion. On March 29, 2007, Plaintiff filed a Motion for Extension of Time to Reply to the Government's March 6, 2007 Response. On April 6, 2007, Plaintiff filed a Reply, with a corrected date on the Certificate of Service.

On March 27, 2007, Plaintiff filed: a Motion to "eliminate the appearance of Contract

---

4. Upon later consolidation of this case with case number 06–701C, case number 06–715C was removed from the ADR process on January 31, 2007.

5. On February 9, 2007, Plaintiff also filed a "Motion to Eliminate insubstantial jurisdictional defenses." On March 1, 2007, the Government filed a Response. On March 27, 2007, Plaintiff filed a Reply.

FA862104D6250 administrative record and any other administrative records for judicial review after the complaints for this judicial administrative review were filed" and a "Motion to enter affidavits of the ADR Moderator." On April 3, 2007, the Government filed Responses to both motions. On May 7, 2007, Plaintiff filed Replies.

On May 8, 2007, Plaintiff filed "Material Facts in Dispute." On May 10, 2007, Plaintiff filed a "Motion to Compel Performance of the contract officer of record" and a Motion to Compel Performance of Contract FA862104D250. On May 24, 2007, the Government filed a Response to Plaintiff's May 10, 2007 Motion to "Compel Performance of the contracting officer of record." On May 25, 2007, the Government filed a Response to Plaintiff's May 10, 2007 Motion to Compel Performance of Contract FA862104D250. On June 4, 2007, Plaintiff filed two motions captioned "Motion to Correct a Certificate of Service," which the court denied on June 5, 2007. On June 4, 2007, Plaintiff also filed two Motions for an Enlargement of Time to respond to the Government's May 24, 2007 and May 25, 2007 Responses. On June 8, 2007 the court granted Plaintiff's Motions.

On June 8, 2007, however, the court also instructed the Plaintiff not to file any new motions without leave. The court took this step reluctantly. Over the course of this lawsuit, Plaintiff has filed over thirty argumentative and repetitive motions. Plaintiff's behavior has bordered on abusive.

## III. DISCUSSION.

### A. Jurisdiction.

The jurisdiction of the United States Court of Federal Claims was established by the Tucker Act, which authorizes the court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act also provides the court with jurisdiction to resolve contract disputes arising under the Contract Disputes Act, 41 U.S.C. § 601 *et seq.* ("*CDA*"), whether seeking monetary or non-monetary relief. *See* 28 U.S.C. § 1491(a)(2) ("The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act."); *see also Alliant Techsystems, Inc. v. United States,* 178 F.3d 1260, 1264 (Fed.Cir. 1999) (holding that under the Tucker Act, as amended, the United States Court of Federal Claims has jurisdiction pursuant to the CDA over certain non-monetary claims).

The Tucker Act, however, is merely "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages ... the Act merely confers jurisdiction upon it whenever the substantive right exists." *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Therefore, in order to pursue a substantive right within the jurisdiction of the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States,* 386 F.3d 1091, 1094 (Fed.Cir.2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act[.]"); *see also Fisher v. United States,* 402 F.3d 1167, 1172 (Fed.Cir.2005) (*en banc*) ("The Tucker Act does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages. In the parlance of Tucker Act cases, that source must be 'money-mandating.'" (citations omitted)). In this case, the source of substantive law is the CDA.

### 1. Jurisdictional Requirements Of The Contract Disputes Act, 41 U.S.C. § 601 *et seq.*

The CDA requires that a contractor submit a written claim to the contracting officer in order to resolve any dispute that arises with respect to the contract between the government and the contractor. 41 U.S.C. § 605(a) ("All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision."). The CDA further requires that the contracting officer issue a final decision on the claim. *Id.* ("The contracting officer shall issue his decisions in writing.... The decision shall state the reasons for the decision reached[.]"). The United States Court of Appeals for the Federal Circuit has enforced this requirement for a final decision as a "jurisdictional prerequisite" to further legal action on the claim. *See Sharman Co., Inc. v. United States,* 2 F.3d 1564, 1569 (Fed.Cir.1993).

The CDA, however, does not define a "claim." *See Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1575 (Fed.Cir.1995). The Federal Acquisition Regulations ("FAR"), on the other hand, do define the term. *See James M. Ellett Constr. Co. v. United States,* 93 F.3d 1537, 1542 (Fed.Cir.1996). Under FAR § 52.233–01, a "claim" includes "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or *other relief arising under or relating to the contract.*" 48 C.F.R. § 52.233–01 (emphasis added). This definition of a "claim" is incorporated, by reference, into the Contract. *See* First Compl. Ref. Doc. at 11–12 (incorporating FAR § 52.233–01 into the Contract).

▆▆▆ The United States Court of Appeals for the Federal Circuit also has provided additional guidance regarding the content of a claim. First, a claim must be a written "demand for something due or believed to be due" and provide the contracting officer with notice of the relief requested and the legal and factual basis for that request. *See Alliant,* 178 F.3d at 1265; *see also Contract Cleaning Maint., Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987). A claim, however, also can be inferred from the specific factual circumstances of the case. *See James M. Ellett,* 93 F.3d at 1542. In the context of monetary claims, a claim cannot be a routine submission to the contracting officer, unless that submission is in dispute. *See Reflectone,* 60 F.3d at 1575. Finally, a claim does not need expressly to request a final decision from the contracting officer, such a request can be inferred "as long as what the contractor desires by its submissions is a final decision[.]" *Transamerica Ins. Corp. v. United States,* 973 F.2d 1572, 1576 (Fed.Cir. 1992).

The CDA also requires that the relevant contracting officer issue a final decision on a claim as a "jurisdictional prerequisite." *See Sharman,* 2 F.3d at 1569. Though a final decision does not require any specific form, the CDA generally requires the contracting officer to issue a decision "within sixty days from his receipt of a written request from the contractor[.]" 41 U.S.C. § 605(c)(1); *see also Alliant,* 178 F.3d at 1267. Although sixty days is the default time period for the contracting officer's final decision, in certain circumstances, the statute allows for a "reasonable time" depending on "such factors as the size and complexity of the claim and the adequacy of the information in support of the claim provided by the contractor." 41 U.S.C. § 605(c)(3); *see also Paragon Energy Corp. v. United States,* 227 Ct.Cl. 176, 645 F.2d 966, 969–70 (1981). These time restrictions serve an important function, since the contracting officer's failure to issue a final decision within the allotted time renders the claim to be deemed denied. 41 U.S.C. § 605(c)(5).

### 2. The United States Court Of Federal Claims Does Not Have Jurisdiction Over Claims Alleged In This Case, Under The Wunderlich Act, 41 U.S.C. §§ 321, 322.

In response to the Government's decision to challenge the court's jurisdiction, Plaintiff argues that subject matter jurisdiction is proper under the Wunderlich Act, 41 U.S.C. §§ 321, 322. *See* Pl. Resp. Mot. Dis. ¶ 3.

In *Essex Electro Eng'rs, Inc. v. United States,* 702 F.2d 998 (Fed.Cir.1983), the United States Court of Appeals for the Federal Circuit described the role of the Wunderlich Act in government contracting disputes. Prior to the enactment of the CDA, in the event of a contract dispute,

> a contractor could pursue two kinds of claims: claims for equitable adjustment under the disputes clause of the contract and claims for breach of contract. Disputes clause claims could be heard and decided by contracting officers and by boards of contract appeals, from which limited judicial review was available in the Court of Claims. The contracting officers and boards were not permitted to decide breach claims, however, which were taken directly to the Court of Claims.

*Essex Electro,* 702 F.2d at 1002. The scope of the "limited judicial review" of disputes clause claims was governed by the Wunderlich Act.[6] *Id.* (citing 41 U.S.C. §§ 321, 322). The Act codified a "substantial evidence" test for review of agency boards' factual decisions. *See United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 713–14, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). Subsequently, Congress established a new legal framework for resolving such disputes, the Contract Disputes Act of 1978, 41 U.S.C. § 601 et seq. See *Essex Electro,* 702 F.2d at 1002. The CDA superseded the Wunderlich Act, with only certain narrow exceptions. See *Essex Electro,* 702 F.2d at 1002 (noting that "[t]he Contract Disputes Act applies to all contracts entered into after March 1, 1979.").

▪ After passage of the CDA, the Wunderlich Act remained applicable to government contract disputes in only two circumstances: (1) when the contracting agency in question is not within the executive branch; or (2) when the contract at issue was entered

into before the effective date of the CDA. *See Tatelbaum v. United States,* 749 F.2d 729, 730 (Fed.Cir.1984) (holding that the United States Court of Appeals for the Federal Circuit did not have jurisdiction under the CDA to review decisions by the United States Government Printing Office Board of Contract Appeals, because it was not part of the Executive Branch); *see also Roflan Co. v. United States,* 7 Cl.Ct. 242, 248 (1985) (applying Wunderlich standard of review to a contract dispute where the contract was entered into before the effective date of the CDA); *Dravo Corp.v. United States,* 219 Ct.Cl. 416, 594 F.2d 842, 843 (1979) (same).

▪ In this case, Plaintiff contracted with the USAF, an agency within the Executive Branch. *See* 41 U.S.C. § 403(1) ("The term 'executive agency' means ... (b) a military department specified in section 102 of [Title 5].") The Contract was entered into on March 22, 2004, well after the effective date of the CDA, March 1, 1979. *See Essex Electro,* 702 F.2d at 1002 (noting that "[t]he Contract Disputes Act applies to all contracts entered into after March 1, 1979"); *DynCorp Info. Sys. v. United States,* 58 Fed.Cl. 446, 456 (2003) (the CDA applies to contracts entered into on, or after, March 1, 1979). Neither of the circumstances exists that would require application of the Wunderlich Act to the adjudication of Plaintiff's claims.

Moreover, the Contract incorporated by reference the "Disputes Clause" of the FAR. *See* First Compl. Ref. Doc. at 12 (citing FAR § 52.233–1). This Clause expressly provides that disputes arising under the Contract are "subject to the Contract Disputes Act." *See* First Compl. Ref. Doc. at 12; *see also* 48 C.F.R. § 52.233–1. Accordingly, Plaintiff's claims alleged in this case are not

---

6. The Wunderlich Act provides:

No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged:

Provided, however, that any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.

No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.

41 U.S.C. §§ 321, 322 (footnote omitted).

subject to review pursuant to the standards set forth in the Wunderlich Act.

### B. Pleading Requirements Of A *Pro Se* Plaintiff.

In the United States Court of Federal Claims, the pleadings of a *pro se* plaintiff are held to a less rigid standard than those of the litigants represented by counsel. *See Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (*pro se* complaints, "however inartfully pleaded," are held to "less stringent standards than formal pleadings drafted by lawyers" (citing *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972))). It has been the tradition of this court to examine the record "to see if [a *pro se* ] plaintiff has a cause of action somewhere displayed." *Ruderer v. United States,* 188 Ct.Cl. 456, 412 F.2d 1285, 1292 (1969). Nevertheless, " '[t]his latitude ... does not relieve a *pro se* plaintiff from meeting jurisdictional requirements.' " *Skillo v. United States,* 68 Fed. Cl 734, 739 (2005) (quoting *Bernard v. United States,* 59 Fed. Cl. 497, 499 (2004), *aff'd,* 98 Fed.Appx. 860 (Fed.Cir.2004)).

### C. Standard For Decision On A Motion To Dismiss, Pursuant To RCFC 12(b)(1).

A challenge to the "court's general power to adjudicate in specific areas of substantive law ... is properly raised by a [Rule] 12(b)(1) motion." *Palmer v. United States,* 168 F.3d 1310, 1313 (Fed.Cir.1999); *see also* RCFC 12(b)(1) ("Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter[.]").

When considering whether to dismiss an action for lack of subject matter jurisdiction, the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir. 1995). Nonetheless, Plaintiff bears the burden of establishing jurisdiction by a prepon-

derance of the evidence. *See Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question, it [is] incumbent upon [plaintiff] to come forward with evidence establishing the court's jurisdiction.").

### D. Standard of Review On A Motion For Summary Judgment, Pursuant to RCFC 56(c).

On a motion for summary judgment, if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. *See Moden v. United States,* 404 F.3d 1335, 1342 (Fed.Cir.2005) ("Summary judgment is only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."); *see also* RCFC 56(c).

Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.... That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Therefore, to avoid summary judgment, the nonmoving party must put forth evidence sufficient for a reasonable factfinder to return a verdict for that party. *Id.* at 248–50, 106 S.Ct. 2505 (citations omitted).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding the moving party must meet its burden "by 'showing'—that is pointing out to the [trial court] that there is

an absence of evidence to support the non-moving party's case."); *see also Riley & Ephriam Constr. Co.*, 408 F.3d 1369, 1371 (Fed.Cir.2005) ("The moving party bears the burden of demonstrating the absence of a genuine issue of material fact."). Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the nonmoving party to show the existence of a genuine issue for trial. *See Novartis Corp. v. Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed.Cir.2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial").

A trial court is required to resolve all doubt over factual issues in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). And, all reasonable inferences and presumptions must be resolved in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *see also Moden*, 404 F.3d at 1342 ("[A]ll justifiable inferences [are drawn] in favor of the party opposing summary judgment").

### E. The Court's Resolution Of The Government's February 9, 2007 Motion To Dismiss.

#### 1. Claims Presented In Plaintiff's First Complaint, 06–701C.

#### a. The United States Court Of Federal Claims Has Jurisdiction Over The Claim That The Government Attempted Unilaterally To Change The Terms Of The Contract.

#### i. Plaintiff's June 19, 2006 E–Mail States A Claim Under The Contract Disputes Act.

The first Complaint (06–701C) alleges that the cautionary statement appended to Mr.

Kimmet's June 15, 2006 e-mail attempted unilaterally to change the terms of the Contract. *See* First Compl. ¶ 21–22. The Government responds that the court does not have jurisdiction, because Plaintiff failed to submit a claim to the CO first requesting relief, as required by the CDA. *See* Gov't Mot. at 15–22. Plaintiff counters that "[t]he company made a claim to the [CO] on June 16, 2006." First Compl. ¶ 3. Plaintiff also states: "This contractor did assert valid Contract Disputes Act claims three times for [this cause of action]." Pl. Resp. Mot. Dis. ¶ 25. Other than providing the July 16, 2006 date for one of these communications, however, the Complaint fails to identify which CO communications were "valid Contract Disputes Act claims." *See* First Compl. ¶ 3; Pl. Resp. Mot. Dis. ¶ 25.

The only communication between Plaintiff and the USAF on June 16, 2006 is Plaintiff's e-mail response to Mr. Kimmet's prior e-mail.[7] *See* First Compl. Att. 6 (June 16, 2006 12:18 p.m. e-mail from Parker International to Daniel Kimmet, Alan Gaudette, Marvin Bozarth, Stan Baker, Norman Kohn, and James Chalifoux).

 The CDA states that a claim must be submitted to the contracting officer. *See* 41 U.S.C. § 605(a) ("All claims by a contractor against the government relating to a contract . . . shall be submitted to the contracting officer for a decision."). The United States Court of Appeals for the Federal Circuit has clarified that a valid claim need not "be sent only to the contracting officer, or necessarily directly to that officer." *D.L. Braughler Co.v. West*, 127 F.3d 1476, 1481 (Fed.Cir.1997) (quoting *Neal & Co. v. United States*, 945 F.2d 385, 388–89 (Fed.Cir.1991)). However, in order to be considered a valid claim, a claim sent indirectly to the contracting officer must "request . . . a final decision

---

7. The June 16, 2006 e-mail provides:
 Dan,
 The company cannot accept the adhesion contract at the bottom of your email. The adhesion contract starts with the word "Caution" and ends with the word "message." *Can you resend this email to the company without the addition of the adhesion contract at the bottom?*

 The company will address the rest of the content of this email transmittal once a correctly format [sic] transmittal is received. This email transmittal, as provided, is the property of the company and may be reproduced, copied, and transmitted by the company as required.
 First Compl. Att. 6 (emphasis added).

of *the contracting officer[.]* " *Id.* at 1481 (emphasis in original). Plaintiff's June 16, 2006 e-mail merely requests that Mr. Kimmet "resend the [June 15, 2006] email without the addition of the adhesion contract[;]" it does not seek a final decision from the CO. *See* First Compl. Att. 6. Accordingly, the court has determined that Plaintiff's June 16, 2006 e-mail response to Mr. Kimmet does not state a claim under the CDA.

█ The next communication between Plaintiff and the USAF regarding the cautionary statement is a June 19, 2006 e-mail from Plaintiff entitled "FA862104D6250 CDRL A001 DI–MGMT–80227/T as SOW Tailored Document Extension of the June 2006 Program Management Report."[8] First Compl. Att. 9; *see also* Gov't Mot.App. at 48–51. The relevant portion of the body of this e-mail is almost identical to Plaintiff's June 16, 2006 e-mail. *Compare id., with* First Compl. Att. 6. However, the June 19, 2006 e-mail also includes eight "notes" that assert various legal grounds for Plaintiff's argument that he was not bound by the cautionary statement included in Mr. Kimmet's e-mail.[9] *See* Gov't Mot.App. at 48–49. The CO received a "Cc" of this e-mail.

The Government argues that this e-mail with attachments is not a claim, because the e-mail did not "seek interpretation of any of the terms of [Plaintiff]'s contract[ ]" and did not specify any "factual, legal, or contractual basis" for Plaintiff's assertion that the cautionary statement should be removed and that Mr. Kimmet's e-mail was the property of Plaintiff. *See* Gov't Mot. at 19. In addition, the Government contends that under *Reflectone,* a claim must be a non-routine submission. *See Reflectone,* 60 F.3d at 1577. The

Government asserts that the June 19, 2006 e-mail, with attached notes, is a routine Contractor Management Report that Plaintiff was required to submit on a monthly basis, pursuant to the express terms of the contract. Gov't Mot. at 19.

As noted earlier, the United States Court of Appeals for the Federal Circuit has held that a valid CDA claim does not require that "claims be sent only to the contracting officer[.]" *D.L. Braughler,* 127 F.3d at 1481. Although the CO was not listed as a direct recipient of the June 19, 2006 e-mail, Plaintiff did include the CO on the "Cc" line of the e-mail. *See* First Compl. Att. 9. In addition, Plaintiff specifically addressed the CO in the body of the e-mail. *Id.* ("Dan and Betty [Clingerman, the CO], The company cannot accept the adhesion contract(s) contained in and added to the bottom of your emails[.]"). Furthermore, although not a model of clarity, the "notes" appended to the June 19, 2006 e-mail state factual and legal grounds for Plaintiff's contention that the Contract could not unilaterally be changed by the terms of the cautionary notice. *See* Govt. Mot.App. at 48–49.

Furthermore, the Government's assertion that the June 19, 2006 e-mail cannot comprise a valid CDA claim, because the Contract required Plaintiff to submit monthly Contractor Management Reports is also unavailing. First, on May 19, 2006, Plaintiff submitted a Contractor Management Report for May and June. *See* Gov't Mot.App. at 108 ("This is a Predator Training System Monthly program management report[10] for the period of May–June 2006."). As a result, Plaintiff's June 19, 2006 e-mail, captioned as

**8.** The June 19, 2006 3:00 p.m. e-mail from Plaintiff states, in relevant part:
Dan and Betty,
The company cannot accept the adhesion contract(s) contained in and added to the bottom of your emails[.] ... Please resend this email to the company without the addition of the adhesion contract contained within and added on the bottom of the transmittal? The company will address the rest of the content of this email transmittal once a correctly format [sic] transmittal is received. Eight notes (not all inclusive of all notes that may be provided) are provided at the end of this email transmittal. First Compl. Att. 9.

**9.** For example, Note 4 appears to argue that Mr. Kimmet lacks authority under the Contract to negotiate any changes with respect to the contract. In addition, Note 7 asserts that e-mails related to the contract are public and that the USAF's attempts to limit their dissemination "may result in a contract modification that is mutually negotiated and mutually signed by [Plaintiff] and the [USAF.]"

**10.** Plaintiff refers to the "contractor management reports" required under the Contract as "program management reports."

an "Extension" is a non-routine submission. *See* First Compl. Att. 9 ("FA862104D6250 CDRL A001 DI–MGMT–80227/T as SOW Tailored Document *Extension of the June 2006 Program Management Report.*" (emphasis added)). Finally, the subject matter makes it clear that this document is not a Contractor Management Report. *See* Gov't Mot.App. at 22 (contract provision requiring that Contractor Management Reports should include "a breakdown of labor hours expended in support of the contract over the past month, [ ] an estimate of hours planned for the coming month[, and] the actions taken in support of this effort to include a detailed listing of functional changes."). Accordingly, the court has determined that, when considered in its entirety, the June 19, 2006 e-mail requests a determination from the CO that the cautionary statement is an attempt to unilaterally change the terms of the contract and, therefore, states a claim under the CDA. *Id.; see also James M. Ellett,* 93 F.3d at 1542 ("a request for a final decision can be implied from the context of the submission" (citation omitted)).

ii. **The Contracting Officer Constructively Denied Plaintiff's Claim By Failing To Issue A Final Decision Within Sixty Days.**

■ An additional prerequisite to the court's jurisdiction under the CDA is that the CO must first issue a final decision on the claim. *See* 41 U.S.C. § 605(a); *see also England v. The Swanson Group, Inc.,* 353 F.3d 1375, 1379 (Fed.Cir.) ("We have held, based on the statutory provisions, that the jurisdiction over an appeal of a contracting officer's decision is lacking unless the contractor's claim is first presented to the contracting officer and that officer renders a final decision on the claim." (citing *James M. Ellett Constr.,* 93 F.3d at 1541–42)). If the CO fails to respond to a contractor's claim, the claim is "deemed denied" and the contractor may proceed with an appeal of the decision. *See* 41 U.S.C. §§ 605(c)(1), (5) (providing that a contracting officer shall "issue a decision on any submitted claim of $100,000 or less within sixty days from his receipt of a written request from the contractor" and that "[a]ny failure by the contracting officer to issue a

decision on a contract claim within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim[.]").

Because Plaintiff submitted a valid claim, but the CO failed to issue a decision on that claim within sixty days, as a matter of law, the CO constructively denied Plaintiff's claim. *See* 41 U.S.C. § 605(c)(5). Accordingly, the court has jurisdiction to adjudicate Plaintiff's claim that the cautionary statement appended to Mr. Kimmet's June 15, 2006 e-mail was a unilateral change to the terms of the Contract. First Compl. ¶ 21–22.

b. **The United States Court Of Federal Claims Does Not Have Jurisdiction Over Plaintiff's Claim For Money Damages Asserted In Case Number 06–701C.**

■ Plaintiff also seeks monetary damages of $1.00 and courts costs estimated at $499. First Compl. § 24. The court does not have jurisdiction to adjudicate Plaintiff's claim for money damages, because Plaintiff never submitted a claim for money damages to the CO. None of Plaintiff's communications with the CO, or any other USAF personnel, seek money damages. *See* First Compl. Att. 1, 4, 6. Accordingly, the court does have jurisdiction to adjudicate Plaintiff's CDA claim for money damages.

c. **The United States Court Of Federal Claims Does Not Have Jurisdiction To Adjudicate Claims Arising Under The Privacy Act, 5 U.S.C. § 552a.**

■ The First Complaint (06–701C) also seeks a declaratory judgment that Mr. Kimmet's use of the cautionary statement is a violation of the Privacy Act, 5 U.S.C. § 552a. First Compl. ¶ 23 (requesting "a judgment ... that [Mr. Kimmet]'s use of the adhesion contract ... is an improper use of the ... Privacy Act of 1974."). Although the Privacy Act creates a civil cause of action for monetary damages, the Act expressly vests jurisdiction for such claims in the United States District Courts. *See* 5 U.S.C. § 552a(g)(1) (providing that an "individual may bring a

civil action against the agency, and the *district courts* of the United States shall have jurisdiction in the matters under the provisions of [5 U.S.C. § 552a]" (emphasis added)). Therefore, the court does not have jurisdiction to adjudicate the First Complaint's claim under the Privacy Act.

### 2. Claims Presented In Plaintiff's Second Complaint (06–715C).

### a. The United States Court Of Federal Claims Does Not Have Jurisdiction Over Plaintiff's Claim Of "False Statement."

▮ Plaintiff's Second Complaint (06–715C) appears to seek a declaratory judgment that the CO's statement in the June 1, 2006 Memorandum that "[t]he contractor reported an absence of discrepancies" is "a false statement" and the CO "knowingly and willfully sustained the false statement when provided sufficient notification and time to correct the mistake." Second Compl. ¶ 51.

The Government argues that the court does not have jurisdiction over the "false statement claim," because it was not submitted to the CO. *See* Gov't Mot. at 15. Plaintiff responds that the June 7, 2006 letter to Generals Hudson and Hoffman constitutes a claim under the CDA and that "claim" should be deemed denied, because sixty days elapsed without a response from the CO. *See* Second Compl. ¶ 16. In addition, Plaintiff argues that: "This contractor did assert valid Contract Disputes Act claims three times for [this cause of action]." Pl. Resp. Mot. Dis. ¶ 25. Plaintiff, however, fails to specify which communications with the CO constitute "valid Contract Disputes Act claims." *Id.* Upon review of the record, the court has determined that there are no other documents that reasonably could be considered a "claim" for purposes of Plaintiff's claim before this court, other than the June 7, 2006 letter.

The June 7, 2006 letter was not addressed to the CO, but to two Lieutenant Generals alleging that the CO's June 1, 2006 Memorandum misconstrued Plaintiff's May 15, 2006 Contractor Management Report and contained "false statements and acts of omis-

sion." Second Compl. Att. 6. With respect to relief, the letter requested "advice on how to remedy the promulgation of [ ] inaccurate and misleading statements and prevent reoccurrences." *Id.*

The court has determined that the June 7, 2006 letter does not constitute a claim under the CDA. A claim must satisfy both the form and functional requirements of the CDA. *See Alliant,* 178 F.3d at 1265. The June 7, 2006 letter was not addressed to the CO. *See* 41 U.S.C. § 605(a) ("All claims by a contractor against the government relating to a contract . . . shall be submitted to the contracting officer for a decision."). Even under the more flexible standard stated by the United States Court of Appeals for the Federal Circuit in *D.L. Braughler,* this letter is insufficient to establish a claim. *See D.L. Braughler,* 127 F.3d at 1481 ("[The CDA] does not, however, require that the claims be sent only to the contracting officer, or necessarily directly to that officer. . . . If . . . the contractor sends a proper claim to its primary contact with a request for a final decision of the contracting officer and a reasonable expectation that such a request will be honored, and the primary contact in fact timely delivers the claim to the contracting officer, then we see no basis for finding that the claim was not submitted to the contracting officer as required under § 605(a)." (quoting *Neal & Co.,* 945 F.2d at 388–89)). The June 7, 2006 letter to Generals Hudson and Hoffman does not request a final decision of the CO. *See* Gov't Mot.App. at 97 (Plaintiff's June 7, 2007 letter to Generals Hudson and Hoffman requesting "*your* advice on how to remedy the promulgation of these inaccurate and misleading statements and prevent recurrences." (emphasis added)).

Furthermore, although it appears that the CO may have been a "Cc" recipient of an e-mail containing the first two paragraphs of the letter sent to Generals Hudson and Hoffman, the CO never received the entire June 7, 2006 letter. *Compare* Gov't Mot.App. at 97 (June 7, 2006 letter), *with* Gov't Mot.App. at 96 (June 7, 2006 e-mail containing the first two paragraphs of the June 7, 2006 letter). This brief e-mail cannot be considered a valid CDA claim because the e-mail did not pro-

vide the CO with clear notice as to the relief requested and the factual and legal basis of the claim. *See Contract Cleaning Maint.*, 811 F.2d at 592. Because Plaintiff never provided the CO with a claim seeking a declaration that the CO's statement was "false" and the CO "knowingly and willfully sustained the false statement when provided sufficient notification and time to correct the mistake," neither the June 7, 2006 letter, nor the June 7, 2006 e-mail state a claim for purposes of the CDA. Accordingly, the court lacks jurisdiction to adjudicate this claim.

### b. The United States Court Of Federal Claims Does Not Have Jurisdiction Over Plaintiff's Claim For Money Damages Asserted In Case Number 06–715C.

Plaintiff also seeks monetary damages of $1.00 and courts costs estimated at $499. Second Compl. ¶ 57. The court does not have jurisdiction to adjudicate Plaintiff's claim for money damages. Plaintiff never submitted a claim for money damages to the CO. Accordingly, the court does not have jurisdiction to adjudicate Plaintiff's claim for money damages.

### F. The Court's Resolution Of The Government's February 9, 2007 Motion For Summary Judgment.

■ The court has determined that it has jurisdiction to adjudicate Plaintiff's claim, asserted in the First Complaint, case number 06–701C, for a declaratory judgment that the cautionary statement appended to Mr. Kimmet's June 15, 2006 e-mail constitutes a unilateral change to the terms of the Contract. *See* First Compl. ¶¶ 21–22.

Plaintiff argues that Mr. Kimmet "required [Plaintiff] to accept an adhesion contract as a requirement for continued contract communications, a requirement for entering an agenda for contracted program meetings, and a requirement for attendance to contracted program management meetings." First Compl. ¶ 1. Plaintiff also argues that "[Plaintiff]'s agreement … to [Mr. Kimmet]'s adhesion contract is a material change to the [C]ontract and changes the disposition of this contract's program management records." *Id.* ¶ 8. Plaintiff asserts that such a change would enable the USAF to "conceal contract actions and contract documents." *Id.* ¶ 13.

The Government responds that Mr. Kimmet had no authority to make any changes to the terms of the Contract. Gov't Mot. at 30. Moreover, Mr. Kimmet did not require Plaintiff to accept the terms of the cautionary statement. *Id.* In any event, the Government argues that the cautionary statement included on Mr. Kimmet's e-mail was not a change to the terms of the Contract, because the Contract already limited Plaintiff's ability to disseminate communications related to the Contract. *Id.* at 31–32.

The court has determined that, as a matter of law, the cautionary statement included in Mr. Kimmet's e-mail did not constitute a material change, because the Contract already restricted Plaintiff's ability to disseminate communications related to the Contract. The Contract incorporated by reference Defense Federal Acquisition Regulation Supplement ("DFARS") § 252.204–7000.[11] First Compl. Ref. Doc. at 11–12 (**NOTICE**: The following contract clauses pertinent to this section are hereby incorporated by reference: … **B. DEFENSE FEDERAL ACQUISITION REGULATION SUPPLEMENT CONTRACT CLAUSES** …

11. DFARS 252.204–7000 provides:
DISCLOSURE OF INFORMATION (DEC 1991)
(a) *The Contractor shall not release to anyone outside the Contractor's organization any unclassified information, regardless of medium (e.g., film, tape, document), pertaining to any part of this contract or any program related to this contract,* unless—
(1) The Contracting Officer has given prior written approval; or
(2) The information is otherwise in the public domain before the date of release.

(b) Requests for approval shall identify the specific information to be released, the medium to be used, and the purpose for the release. The Contractor shall submit its request to the Contracting Officer at least 45 days before the proposed date for release.
(c) The Contractor agrees to include a similar requirement in each subcontract under this contract. Subcontractors shall submit requests for authorization to release through the prime contractor to the Contracting Officer.
48 C.F.R. § 252.204–7000 (emphasis added).

252.204–7000 "DISCLOSURE OF INFORMATION" (emphasis in original)); Gov't Mot.App. at 11–12. The express terms of this provision limited Plaintiff's authority to disseminate "any unclassified information, regardless of medium … pertaining to any part of this contract or any program related to this contract" unless the contractor received permission from the CO or the material was already in the public domain. *See* 48 C.F.R. § 252.204–7000.

The cautionary statement advised only that the e-mail recipient should not "disseminate this message without the approval of the sender." First Compl. Att. 7. This requirement is less restrictive than the terms of DFARS § 252.204–7000. *See* 48 C.F.R. § 252.204–7000 ("The Contractor shall not release to anyone outside the Contractor's organization any unclassified information, regardless of medium (*e.g.,* film, tape, document), pertaining to any part of this contract or any program related to this contract[.]"). Moreover, the cautionary statement was only advisory in nature. *See* Gov't Mot.App. at 116 (April 19, 2004 Memorandum from the Assistant Secretary for the Air Force for Acquisition directing the use of the cautionary statement). Accordingly, the court has determined, as a matter of law, that the cautionary statement included with Mr. Kimmet's June 15, 2006 e-mail was consistent with the terms of the Contract and was not a unilateral change thereto.

## IV. CONCLUSION.

For the aforementioned reasons, the Government's February 9, 2007 Motion to Dismiss is granted in part and denied in part.

With respect to the claims asserted in Case 06–701C, the Clerk of the United States Court of Federal Claims will dismiss Plaintiff's claim under the Privacy Act, 5 U.S.C. § 552a and Plaintiff's claim for monetary damages. The Clerk of the United States Court of Federal Claims will dismiss the Complaint filed in Case 06–715C.

The Government's February 9, 2007 Motion for Summary Judgment is granted in part. The Clerk of the Court is ordered to enter judgment in favor of the Government on Plaintiff's claim, asserted in Case 06–

701C, for a declaratory judgment that the cautionary statement appended to Mr. Kimmet's June 15, 2006 e-mail constitutes a unilateral change to the terms of the Contract.

Because all of Plaintiff's claims have been dismissed, or adjudicated in favor of the Government, the Clerk of the Court is ordered to dismiss all other pending motions in this case, with prejudice.

**IT IS SO ORDERED.**